## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) LENA MORALEZ, as Administrator of the Estate of FRANK GREIGO, deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| (1) TURN KEY HEALTH CLINICS, LLC, (2) SHERIFF OF CLEVELAND COUNTY, in his official capacity, | ) ) ) ) ) ) ) | Jury Trial Demanded  Attorney Lien Claimed |
| Defendants. | ) | |

## COMPLAINT

**COMES NOW**, Lena Moralez, ("Plaintiff"), as the Administrator of the Estate of Frank Griego ("Mr. Griego"), deceased, and for her causes of action against the above-named Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1.    Plaintiff was, at the pertinent times underlying this Complaint, a resident of Oklahoma. Plaintiff is the Administrator of the Estate of Frank Griego, deceased. The causes of action in this matter are based on violations of Mr. Griego's rights under the Fourteenth Amendment to the United States Constitution.

2.    Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Cleveland County, Oklahoma. Turn Key is a private correctional health care company that contracts with counties, including, during the pertinent timeframe, Cleveland County, to provide medical professional staffing, supervision and care

in county jails. Turn Key was at all times relevant hereto responsible, in part, for providing medical services, supervision and medication to Mr. Griego while he was in the custody of the Cleveland County Sheriff's Office ("CCSO"). Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Cleveland County Jail, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Cleveland County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

3.    Defendant Sheriff of Cleveland County ("Sheriff" or "Defendant Sheriff") is the Sheriff of Cleveland County, Oklahoma, residing in Cleveland County, Oklahoma and acting under color of State law. The Sheriff is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing The Sheriff in his official capacity, Plaintiff has brought suit against the County/CCSO.

4.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

5.    The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

6.    Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

7.    Paragraphs 1-6 are incorporated herein by reference.

### A. Facts Specific to Mr. Griego

8.    Arrest records show Mr. Griego was booked into the Cleveland County Jail ("Jail") on or around October 30, 2023.

9.    At all pertinent times, Mr. Griego was a pre-trial detainee.

10.    Mr. Griego suffered severe mental illness, including schizophrenia.

11.    Turn Key Emergency Medical Technician ("EMT") Kayley French conducted the medical intake screening of Mr. Griego, the morning of October 30, 2023.

12.    Upon information and belief, Mr. Griego was showing obvious signs of his severe mental illness, which required treatment with prescribed psychotropic medications.

13.    EMT French, however, ignored Mr. Griego's severe mental illness and placed him in general population at the Jail.

14.    Upon information and belief, during his first two weeks at the Jail, Mr. Griego was assaulted multiple times by other inmates, likely due to his uncontrolled mental illness.

15.    The worst of these assaults occurred on or about November 13, 2023. The night of November 13, Mr. Griego's cellmate began viciously attacking him while he was asleep in

3

his cell. The assault left Mr. Griego with cuts and bruises all over his body, severe pain, and a large laceration on his forehead.

16.    The following day, November 14, 2023, during evening pill pass, a Jail guard noticed the laceration on Mr. Griego's forehead and bruising on his head and face. The jailer took Mr. Griego to the medical unit of the Jail for evaluation.

17.    Turn Key employee Taylor Adams assessed Mr. Griego at approximately 7:00 p.m. on November 13. Mr. Griego reported that he had been attacked multiple times and that the previous night, his cell mate dragged him off his bunk, slammed him onto the ground several times, and punched him. Mr. Griego reported pain all over his body.

18.    Adams noticed one laceration on Mr. Griego's forehead that appeared to be older, and another fresh laceration on his nose that was actively bleeding. Adams also noticed that Mr. Griego's breathing was shallow.

19.    Mr. Griego's pupils were also not dilated. Combined with the fact that Mr. Griego had bruises and cuts on his face and reported having been viciously assaulted, the state of his pupils indicated that he may have suffered a concussion.

20.    The night of November 13, 2023, Mr. Griego was transported to Norman Regional Hospital ("NRH"), where he was admitted as a patient.

21.    Mr. Griego reported his recent assaults to the NRH providers. He also told them he had chest pain, nose pain, and shortness of breath.

22.    Providers at NRH diagnosed Mr. Griego with multiple fractured ribs, a nasal bone fracture, acute kidney failure, anemia, a transverse process fracture (fracture of the side of a

vertebra), and a left pneumothorax, meaning his left lung had collapsed as a result of the assault.

23.   NRH providers noted that Mr. Griego's obvious schizophrenia was not being treated at the Jail.

24.   NRH providers had to insert a chest tube into Mr. Griego's left lung due to the pneumothorax.

25.   On November 15, 2023, NRH providers removed Mr. Griego's chest tube. While his pneumothorax was beginning to improve, he was showing signs of an infection. His temperature was 100.3[1] degrees, his pulse was elevated (103 bpm), his blood pressure was slightly elevated (130/86), and he had diarrhea.

26.   On November 16, 2023, NRH providers cleared Mr. Griego to be discharged from the hospital.

27.   The discharge instructions warned that a pneumothorax may go away on its own but typically takes one to two weeks to heal. Mr. Griego was advised to avoid activity that could injure his chest, stop any activity that causes pain, and to rest as much as possible to allow his body to heal.

28.   NRH's discharge plan of care also mandated that band-aid type dressings needed to be applied to Mr. Griego's chest drain sites daily and as needed for drainage.

29.   NRH further advised Mr. Griego to call a doctor or return to the ER immediately if he experienced: 1) sudden, sharp pain in the chest that gets worse with coughing or deep

---

[1] Mr. Griego's temperature was 97 degrees upon his admission to NRH on November 13, and steadily rose to 100.3 by the afternoon of November 16.

breaths; 2) sudden problems breathing; 3) tightness in the chest; 4) blush color of the skin; or 5) lightheadedness or fainting.

30.    Upon information and belief, Mr. Griego was transported from NRH back to the Jail in the afternoon or evening of November 16, 2023. NRH provided Jail and Turn Key personnel with Mr. Griego's full medical record from his November 13-16 stay upon his discharge. Indeed, Turn Key employee Nicole Musgrove scanned Mr. Griego's NRH records into the Jail/Turn Key's system the morning of November 17, 2023.

31.    Once back at the Jail, Mr. Griego still had numerous large, open lacerations on his body that NRH providers had dressed. Due to Mr. Griego's mental illness, however, he often fidgeted with and scratched his wounds, increasing the risk of infection.

32.    Upon information and belief, Mr. Griego was *not* given another medical intake once he arrived back at the Jail on November 16, contrary to Jail and Turn Key policy.

33.    However, the afternoon of November 16, EMT French entered a note on Mr. Griego's Turn Key chart acknowledging his most recent vitals from NRH (100.3 temperature, 130/86 BP, 103 pulse), the wounds on his face and finger, and the fact that he was prone to picking at the dressings on his wounds. His vital signs were taken at approximately 5:49 p.m. on November 16, and were shown to be declining. Indeed, Mr. Griego's temperature had increased to 100.8 and his pulse was 115.

34.    Upon information and belief, Turn Key providers failed to closely monitor Mr. Griego upon his return to the Jail, despite his recent hospitalization, serious medical

conditions, and alarming and worsening vital signs. Turn Key providers failed to give Mr. Griego any medications for his mental illness[2] or his serious medical conditions.

35.   Upon information and belief, Turn Key and Jail staff simply placed Mr. Griego back in general population on November 16 and ignored him.

36.   After November 16, Mr. Griego's condition starkly declined, but Jail staff and Turn Key staff alike ignored his obvious and worsening medical condition.

37.   Upon information and belief, Mr. Griego kept picking at his wounds, worsening his infection. Upon information and belief, Turn Key and Jail staff failed to clean and change Mr. Griego's dressings as mandated by the hospital.

38.   Mr. Griego received no medical treatment whatsoever at the Jail on November 16, 17, 18, 19, 20, 21, or 22. Nor were his vital signs taken other than the evening of November 16.

39.   Upon information and belief, Mr. Griego spent November 16-22 laying on the floor of his cell, hardly moving and barely eating or drinking. His infection worsened and he contracted pneumonia due to his previous infection and pneumothorax.

40.   Upon information and belief, Mr. Griego experienced sharp chest pain, tightness in his chest, lightheadedness, and trouble breathing.

---

[2] However, on the afternoon of November 17, 2023, Turn Key nurse Natasha Kairu, LPN scheduled an urgent referral to mental health for Mr. Griego for November 20, describing the need for the referral as "NEEDS MH MEDS." Inexplicably, on November 20, the appointment was rescheduled from November 20 to November 22. Mr. Griego was ultimately never seen by a mental health provider at the Jail and never received any mental health medications.

41.  Upon information and belief, Mr. Griego reported these symptoms to Jail staff and Turn Key staff on November 17-22. Further, upon information and belief, Mr. Griego's cellmate reported to Jail staff and Turn Key staff about Mr. Griego's worsening condition and that he just laid around all day in his cell, barely responsive. Mr. Griego, however, was refused any treatment, was not assessed by a physician, nurse, or mid-level provider, and was not sent back to the hospital, contrary to the discharge instructions from NRH.

42.  Upon information and belief, Mr. Griego also became incontinent, and spent large portions of November 17-22 laying in his own urine and feces. Still, Jail and Turn Key staff failed to take any steps to provide Mr. Griego *any* medical or mental health treatment.

43.  Upon information and belief, by approximately November 18, 2023, Mr. Griego stopped talking, had obviously labored breathing, and could not get up on his own. Upon information and belief, Mr. Griego's cellmate kept attempting to get medical attention for Mr. Griego from Jail and Turn Key staff, but was ignored.

44.  By November 23, 2023, Mr. Griego's condition took another sharp turn for the worse. Upon information and belief, his cellmate again attempted to get medical attention for him, but was unsuccessful.

45.  Finally, at approximately 6:00 p.m. on November 23, Nurse Kairu went to Mr. Griego's cell in response to one of his cellmate's pleas. The cellmate told Nurse Kairu that Mr. Griego had been laying on his bunk for the past several days, had not eaten, and was nonresponsive.

46.    Nurse Kairu noticed that Mr. Griego's pupils were pinpoint and that he had defecated all over himself. Mr. Griego's breathing was clearly labored and he had a blank stare on his face.

47.    Mr. Griego's blood pressure and temperature were taken – the first time any vitals had been taken since November 16 – and the results were alarming. Mr. Griego's blood pressure was dangerously low (90/60) and his temperature had risen to 101.4.

48.    Mr. Griego went into cardiac arrest and Nurse Kairu had a jailer call for an ambulance. The EMTs who responded to the scene intubated Mr. Griego and performed CPR. The EMTs were able to revive Mr. Griego on the way back to NRH and took him to the ER the evening of November 23, 2023.

49.    Back at NRH, Mr. Griego was diagnosed with sepsis due to streptococcus bacteria, bilateral pulmonary emboli, acute kidney injury, anemia, problem with pulmonary contusions, and multiple rib fractions.

50.    Shortly after arriving back at NRH, Mr. Griego became pulseless again. CRP was resumed and he was given additional epinephrine, sodium bicarbonate, and calcium. Providers were able to achieve Return of Spontaneous Circulation ("ROSC") for Mr. Griego.

51.    Mr. Griego proceeded to code several more times, and was pronounced dead at the hospital on or about November 25, 2023.

52.    The Medical Examiner determined that Mr. Griego's likely cause of death was complications due to his pulmonary emboli.

**B.  CCSO and Turn Key's Policy and Custom of Inadequate Medical Care**

53.    The deliberate indifference to Mr. Griego's serious medical needs and his safety, as summarized *supra*, was in furtherance of and consistent with: a) policies, customs, and/or practices which CCSO promulgated, created, implemented or possessed responsibility for the continued operation of; and b) policies, customs, and/or practices which Turn Key developed and/or had responsibility for implementing.

54.    To the extent that no single officer or professional violated Mr. Griego's constitutional rights, the County/Sheriff and Turn Key are still liable under a theory of a systemic failure of policies and procedures as described below. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Mr. Griego was effectively denied constitutional conditions of confinement.

55.    For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state. Turn Key used its political connections to obtain contracts in a number of counties, including Cleveland County, Canadian County, Tulsa County, Oklahoma County, Ottawa County, Pottawatomie County, Muskogee County, Garfield County and Creek County. Turn Key now has contracts with county jails in over ten (10) states and with hundreds of counties.

56.    Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Mr. Griego's death, the County/CCSO knew, or should have known, that Turn Key's grossly deficient system and "plan" posed excessive risks to the health and safety of inmates, like Mr. Griego, who suffer from serious and complex medical conditions.

57.    To achieve net profits, Turn Key implemented policies, procedures, customs, or

practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

58.    Upon information and belief, under the Contract in effect while Mr. Griego was housed at the Jail, Turn Key was responsible to pay the costs of all pharmaceuticals at the Jail up to just $40,000 per year (both prescription and over-the-counter). If the annual pharmaceutical costs exceeded this limit, CCSO/Cleveland County was responsible for the excess costs.

59.    Similarly, Turn Key was responsible to pay the costs for all off-site medical services and hospitalizations up to just $50,000 per year, and CCSO/Cleveland County was responsible for any excess costs of inmate hospitalizations and off-site medical care.

60.    The Contract provided that Turn Key will arrange and bear the cost of hospitalization of inmates who – in the opinion of the Turn Key treating physician or medical director, require hospitalization – up to the agreed-upon limit.

61.    There are no provisions in Turn Key's contract creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. Turn Key's contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail from receiving adequate medical care.

62.    These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, like Mr. Griego, at the Jail and to avoid off-site medical costs.

63.    These financial incentives create risks to the health and safety of inmates like Mr.

Griego who have serious medical and mental health conditions such as infection, respiratory issues/disease, heart disease, sepsis, and schizophrenia.

64.    Turn Key provides inadequate guidance, training and supervision to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical and/or mental health needs.

65.    Specifically, Turn Key has an established practice of failing to adequately assess and treat -- and ignoring and disregarding -- obvious or known symptoms of emergent and life-threatening conditions.

66.    These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical or mental health needs, including infection, respiratory issues/disease, heart disease, sepsis, and schizophrenia.

67.    Turn Key has an established policy, practice, and/or custom of allowing undertrained and under-supervised LPNs and unlicensed medical assistants, such as CNAs, to, *de facto*, run the medical unit at the Jail.

68.    Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

69.    Upon information and belief, the healthcare delivery system at the Cleveland County Jail is nearly entirely overseen and implemented by LPNs, like Nurse Kairu, who have not been properly trained – and are not licensed to – provide adequate healthcare in complex and emergent situations.

70. This medical delivery "system" is facially unconstitutional and violates Oklahoma law.

71. Decisions related to the assessment and treatment of Mr. Griego were largely made by unsupervised LPNs who failed to refer Mr. Griego to a physician, mid-level provider, or registered nurse ("RN").

72. Indeed, Mr. Griego was never seen nor assessed by a physician, mid-level provider, or even an RN while he was at the Jail.

73. Additionally, Turn Key has an established practice of failing to adequately assess inmates with complex and serious medical and mental health needs, including a failure to regularly take vital signs. Indeed, Mr. Griego's vital signs were not taken on November 17, 18, 19, 20, 21, or 22, and were only taken on November 23 when he was found unresponsive in his cell. Had anyone taken Mr. Griego's vitals between November 16 and November 22, they would have noticed his increasing temperature, decreasing blood pressure, and dangerously decreased oxygen saturation, all signs that Mr. Griego required immediate transport to the ER.

74. Even on the rare occasions Turn Key staff takes vital signs from inmates with complex and serious medical and mental health needs, like Mr. Griego, Turn Key has an established practice of failing to train medical and mental health staff on what constitutes alarming vital signs; when to report alarming vital signs to a physician; and failing to send inmates with complex and serious medical and mental health needs to an outside medical facility for an adequate assessment and treatment.

75. Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in countless cases in both Cleveland County

and across the country, in addition to Mr. Griego's.

76. These other cases bear numerous similarities. Indeed, in most of the deaths and negative outcomes at jails in which Turn Key is the medical provider, there exist some variation of the following circumstances: 1) Turn Key employees ignore or fail to address the symptoms and concerns reported to them; 2) non-medical professionals, including jailers or other inmates, pleading with Turn Key employees to further assess or treat inmates; 3) inmates begging Turn Key employees to take them to the hospital; 4) inmates complaining of symptoms for hours on end; 5) inmates manifesting visible symptoms for hours on end; 6) Turn Key employees being aware of inmates' medical histories and ignoring symptoms related to those histories; 7) Turn Key employees delaying in getting inmates assessed by a physician, leading to their disabilities and deaths; 8) Turn Key employees delaying in hospitalizing inmates, leading to their disabilities and deaths; and 9) inmates with serious and emergent medical conditions being "assessed" and treated by unsupervised individuals with minimal and utterly inadequate medical training and licensure, such as LPNs or medical assistants.

77. For instance, in November 2014, while detained at the Cleveland County Jail, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life threatening brain infections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided.

78. Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide

14

written consent for Mr. Autry to receive emergency surgery.

79.    He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection." Mr. Autry underwent emergency brain surgery and subsequently a serious of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe.

80.    Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

81.    In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair. Mr. Huff's estate reached a settlement with Garfield County for $12,500,000 dollars and a confidential settlement with Turn Key. Upon information and belief, Turn Key employees were criminally charged in connection with their treatment of Mr. Huff.

82.    An El Reno man died in 2016 after being found naked, unconscious and covered in his own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

83.    A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints -- over several days -- of breathing problems were disregarded by responsible staff, and he lost

15

consciousness.

84.    Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016.  Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated.  Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He lay in his own urine and feces because the jail staff told Smith he was faking paralysis and refused to help him.

85.    In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon,

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history... [H]e was involved in being struck by a car while riding bicycle several weeks ago. ... *He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection* in result of his critical illness [and] hospitalization, but then *while in jail, he deteriorated significantly and his <u>clinical deterioration went unrecognized and untreated</u>* until he was nearly completely quadriplegic.

(emphasis added).

86.    On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa

16

County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was suffering from severe opioid withdrawal. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017.

87.    Mr. Lee was largely assessed and treated by LPNs during his nearly three-week incarceration at the Jail before his death.

88.    A physician never once saw Mr. Lee for a week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

89.    In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions – including performing a medical intake evaluation – in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County Jail jailers were aware of the same symptoms and performed wholly inadequate, less than one second long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

90.    In November 2018, Misty Bailey, a pretrial detainee at the Ottawa County Jail, began to suffer from severe chest pain and elevated heart rate. She eventually started vomiting, could not hold down any food or medications, and also began experiencing lower back pain and severe pain when urinating. Despite being informed of these symptoms, Turn Key medical staff refused to assess Ms. Bailey or send her to a hospital. For two days Ms. Bailey continued to deteriorate, eventually experiencing a fever of 103 degrees and a seizure, at which point detention staff informed Ms. Bailey she would be taken to a hospital only if she agreed to be released on her own recognizance and assume financial responsibility for her medical care.

91.    At the hospital, Ms. Bailey was diagnosed with a bacterial UTI infection that had progressed to her kidney. In its Order denying Turn Key's motion to dismiss, this Court emphasized that *Monell* liability is adequately alleged at the pleading stage where a plaintiff points to comparable instances at other facilities operated by Turn Key: "Plaintiff cites numerous instances at other prison medical facilities operated by Turn Key in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care. At the pleading stage, the Court found "that plaintiff's allegations are sufficient to support an inference that plaintiff was denied medical care for serious condition due to an official policy or custom, and Turn Key's motion to dismiss should be denied." *Bailey v. Turn Key Health Clinics, LLC*, No. 20- CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sep. 17, 2021). The case settled confidentially and a stipulation of dismissal was filed on December 10, 2021.

18

92.    On September 6, 2019, Dunniven Phelps was booked in to the Tulsa County Jail.

93.    During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form.  Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition.  During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

94.    During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and blurry vision, which are common symptoms of a stroke.

95.    Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

96.    Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

97.    By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

98.    At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

99.    Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

100.    Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, *ever gave Mr. Phelps any medications during his time at the Jail.*

101.    On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a DO threatened to "Taze" Mr. Phelps if he didn't get off the ground.

102.    Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

103.    At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann.

104.    Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

105.    At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practical Registered Nurse ("APRN").

106.    APRN Martin noted that Plaintiff had a *"3 day history of evolving stroke like*

*symptoms.*" She also noted that Plaintiff's "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Plaintiff's blood pressure was 183/114, which is considered a *hypertensive crisis that requires immediate consultation and assessment by a physician.*

107.   Mr. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on September 7, 2019.

108.   Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, live-saving treatment.

109.   Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

110.   Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

111.   From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. Davenport provided Turn Key staff with the names of his providers, his need for HIV medications, and the names of those medications. When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could

charge Davenport $15/visit.

112.   In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear sings of infection. Turn Key staff failed to properly assess, evaluate, or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

113.   In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail.

114.   Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff at the Creek County Jail.

115.   By July 8, 2021, at the latest, Mr. White began experiencing shortness of breath and coughing. On information and belief, Mr. White also stopped eating and was refusing meal trays. These drastic changes in Parish's condition, particularly in light of the ongoing COVID-19 pandemic, made it obvious, even to a layperson, that Perish needed emergent evaluation and treatment from a physician.

116.   *From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs,* despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail.

117.   On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure. At the time, his oxygen saturation level was in the 70's. He was diagnosed with acute kidney failure. He was placed on life support, including a

ventilator and dialysis.

118. Mr. White died on July 30, 2021.

119. On April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider.

120. Ms. Sullivan had a history of severe mental illness, including depression, bipolar disorder, schizophrenia, and several previous suicide attempts.

121. Ms. Sullivan was housed at the OCJ for nearly a year prior to her death. Throughout her time at OCJ, she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia.

122. Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting.

123. In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

> *DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.*

124. Yet Turn Key providers allowed Ms. Sullivan to languish in her cell for months, cationic and barely eating, until her eventual death.

125. After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms. Sullivan] went from 148 when she got here to ... *she looks like a skeleton."* Captain

Wagner also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that *medical (in the Jail) wasn't providing her care enough.*"

126. Another staff member told an investigator that Ms. Sullivan deteriorated *"to a bag of bones."*

127. On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

128. On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

129. Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

130. Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

131. In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any other medical provider of Mr. Stewart's condition, complaints, or her decision making.

132. On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and a belief that it might be associated with his back.

133. On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the ...floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart asked "multiple times" to be transported to the hospital, that he was experiencing the worst pain he had ever been in and he could not handle it."

134.   In response, Nurse Stehr called a Turn Key NP, *whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily worsening – symptoms and condition.*

135.   On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previous, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

136.   Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

137.   After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

138.   Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

139.   On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, NRH provided discharge instructions to the Jail and Turn Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

140.   On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key Nurse Natasha Kariuki[3]: 1) chest pain of 10/10; and 2) spitting up blood. Nurse

---

[3] Upon information and belief, Nurse Kariuki also goes by the surname "Kairu." Thus, Nurse "Kariuki," who was involved in the "care" of Mr. Stewart, also had involvement in the "care" of Mr. Griego, as discussed, *supra.*

Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous…in the toilet."

141.   In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."

142.   Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.

143.   On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new conditions, including difficulty breathing and persistent coughing.

144.   In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."

145.   On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood streaked sputum and had heartburn.

146.   Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.

147.   On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

148.   Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's

discharge instructions.

149.   Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

150.   No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

151.   Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

152.   The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

153.   Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive heart failure, and hyponatremia.

154.   On August 3, 2021, Gregory Neil Davis was arrested by Oklahoma City Police Department ("OCPD") Officers and transported to the OCJ.

155.   Mr. Davis was charged with indecent exposure, and was observed by officers to be in the midst of an obvious mental health crisis.

156.   Upon arriving at the OCJ, Mr. Davis was not evaluated by Turn Key personnel, nor was he tested for COVID-19 or have his vital signs taken.

157.   Mr. Davis was finally seen by a Turn Key provider, Sanaria Okongor, LPC, on August 6, 2021. Ms. Okongo noted that Mr. Davis suffered from signs of psychosis, but she

made no treatment recommendations or took any actions other than to recommend follow-up a few days later.

158. Ms. Okongor saw Mr. Davis again on August 9, 2021 and again noted he appeared to be suffering from psychosis. Ms. Okongor again failed to make any treatment recommendations or take any actions, including taking vital signs or referring Mr. Davis to a higher-level provider.

159. For at least the final few days of Mr. Davis's life – from August 9-12, 2021 – inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help but no one came to assist him, provide him medical care, or refer him to a physician or outside medical provider.

160. On the morning of August 12, 2021, at approximately 6:45 a.m., Mr. Davis was observed in his cell in need of emergency medical attention by Lt. Morris and Ronald Anderson, employees and/or agents of the Oklahoma County Criminal Justice Authority ("OCCJA").

161. Upon information and belief, EMSA was not called until approximately 9:17 a.m. When EMSA arrived, paramedics transported Mr. Davis to a nearby hospital, where he was pronounced dead.

162. Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time, often more than 24 hours.

163. From August 3-12, 2021, the only Turn Key personnel who saw, evaluated, assessed, or "treated" Mr. Davis was an LPC, who saw Mr. Davis on two occasions.

164.   Mr. Davis was never seen by a Turn Key physician nor was he referred to an outside medical provider other than the day of his death, when it was far too late.

165.   In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year.

166.   The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. He had also been ingesting his own urine and feces according to reports.

167.   The medical examiner's report noted that Mr. Price was COVID-19 positive when he died, but the official cause of death was listed as "acute dehydration and malnutrition."

168.   For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions. Nor did Turn Key personnel refer Mr. Price to an outside medical provider.

169.   On December 24, 2021, Dean Stith, a 55-year-old man, was booked into the Tulsa County Jail after being arrested for the non-violent misdemeanor of false reporting of a crime.

170.   Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Indeed, upon information and belief, the charges Mr. Stith faced – false reporting of a crime – were the result of symptoms of his dementia.

171.   During the book-in process, on December 25, 2021 at approximately 12:14 a.m.,

Turn Key employee/agent James Flora, LPN filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Stith: was being treated for hypertension; had an unstable gait; had open sores and wounds on both of his hands; was disheveled, disorderly, and insensible.

172.   Mr. Stith's condition continued to deteriorate throughout his stay at the Jail.

173.   On January 7, 2022, Mr. Stith's blood pressure was measured at 101/68, his pulse was 60, which is in the low range. Inexplicably, his oxygen saturation was not taken.

174.   Also on January 7, Judy Wagga, a Turn Key Psychiatric Nurse Practitioner, saw Mr. Stith and noted that he "appeared to be responding to internal stimuli." This was a sign that Mr. Stith was suffering from acute psychosis, an emergent situation.

175.   On January 8, 2022, Mr. Stith's pulse rose to 98 and his blood pressure rose to 124/97. Yet, despite these fluctuations, Mr. Stith was not put on any blood pressure medicine or given additional treatment.

176.   On January 9, 2022, Alicia Irvin, Turn Key psychologist, noted Mr. Stith's dementia and wrote that he had slurred speech, a new alarming symptom, and was not responding appropriately to questions. Dr. Irvin described Mr. Stith as having a "Major Neurocognitive Disorder." But Mr. Stith was not sent to an outside medical provider nor referred to a physician.

177.   Mr. Stith's pulse had also plummeted to 56, which is considered bradycardia. Bradycardia can be a serious problem if heart can't pump enough oxygen-rich blood to the body. Symptoms of bradycardia include confusion, such as the confusion repeatedly displayed by Mr. Stith.

178.  By this point it was abundantly clear that Mr. Stith was suffering from a condition that could not be adequately treated in a correctional setting. With negligence and deliberate indifference, Dr. Irvin, who is not a physician, failed to call for an ambulance or otherwise ensure that Stith was urgently evaluated by a physician.

179.  At approximately 2:46 p.m. on January 9, Turn Key Nurse Sarah Lewis, LPN, observed Mr. Stith *"drooling, tangential thought, not responding appropriately to questions, diminished skin turgor,*[4] *2+ pitting edema to BLEs, and full body weakness."* Nurse Lewis also noted that Mr. Stith was *unable to urinate.*

180.  Particularly when coupled with his worsening condition over a period of days,  Nurse Lewis' note clearly reflects that Mr. Stith was in a dire condition and in obvious need of emergent care that could not be provided in a correctional setting. Nonetheless, with negligence and deliberate indifference, Nurse Lewis failed to call for an ambulance or even contact a physician.

181.  On January 10, 2022, at approximately 4:05 a.m., Mr. Stith was found wedged between his bunk and the wall in his cell. TCSO Detention Officer Davis notified Turn Key Nurses Nikki Copeland and Sarah Schumacher, who found that Mr. Stith was "cool to the touch and arms contracted to chest."

182.  EMSA was called and paramedics arrived at approximately 4:39 a.m., finding Mr. Stith unresponsive. The EMSA paramedics documented that Jail *"health care staff are poor historians* and are unsure of timeline."

---

[4]        A decrease in skin turgor is a late sign of dehydration.

183.   The paramedics noted that Mr. Stith was displaying decorticate posturing, which is a pose in which someone has rigid, extended legs, arms bent toward the center of their body, pointed and turned in toes, curled wrists, and balled hands. Decorticate posturing is caused by abnormal brain conditions such as a stroke, concussion, traumatic brain injury, brain bleed, brain tumor, or infection. Mr. Stith was transferred to St. John Medical Center where he presented in cardiac arrest.

184.   Providers at St. John were unable to resuscitate Mr. Stith, who passed away shortly after his arrival.

185.   The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to: 1) acute bronchopneumonia[5] due to complications of COVID-19; and 2) hypertensive atherosclerotic cardiovascular disease.

186.   Mr. Stith's Estate brought claims, pursuant to 42 U.S.C. § 1983, against the Tulsa County Sheriff, Turn Key, and Turn Key employees Sarah Lewis, LPN and Rhonda Higler, APRN. On July 8, 2025, Judge John D. Russell denied the defendants' motions to dismiss. *See Crawford v. Turn Key Health Clinics, LLC, et al.,* 24-CV-6-JDR-SH (N.D. Okla.) at Doc. No. 48.

187.   On December 12, 2022, Shannon Hanchett died at the Cleveland County Jail.

188.   Ms. Hanchett was a mother of two boys and a pillar of the local community.  She was the owner of Norman's Cookie Cottage, a well-known and popular bakery in Norman, OK.

---

[5]      Symptoms of bronchopneumonia include muscle aches, confusion or delirium.

189.  Ms. Hanchett had a bachelor's degree and a master's degree in Human Relations from the University of Oklahoma.  She began her career helping children at the Oklahoma Department of Mental Health Services, where she worked for almost a decade advocating for mental health care. Tragically, she would later find herself in the same position as the vulnerable people she had passionately tried to help.

190.  In October of 2022, Ms. Hanchett went to the hospital for severe headaches, but a CT scan found no abnormalities.  A few weeks later, she began to exhibit signs of mental illness consistent with bipolar disorder and/or schizophrenia. She had no prior history of illness

191.  The following month, Ms. Hanchett began to hallucinate and became convinced that her husband of 17 years, Daniel, had tapped the cell phone he had recently bought for her.

192.  On the evening of November 26, 2022, Ms. Hanchett entered an AT&T Wireless store in Norman, hoping to buy a new cell phone.  While in the store, she exhibited obvious signs of psychosis.

193.  Clearly confused, distressed, and suffering from delusions, Ms. Hanchett asked a store employee to call 911, and a Norman Police Department ("NPD") Officer responded to the scene.

194.  The Officer acknowledged that Ms. Hanchett appeared to be exhibiting behavior consistent with a mental health disorder.  Nevertheless, he arrested Ms. Hanchett for misdemeanor obstruction and transported her to the Cleveland County Jail ("Jail"). Video from the officer's body-worn camera shows that Ms. Hanchett is disoriented and terrified at the prospect of being arrested.

195. Ms. Hanchett had no criminal history. This was her first time in a detention facility. She was a pretrial detainee.

196. Jail surveillance video shows Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis, continued to deteriorate after arriving at the Jail.

197. Turn Key nurse Danille Hay, LPN, began the medical intake process with Ms. Hanchett but later claimed she was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis.

198. Nurse Hay *was* able to chart, however, that Ms. Hanchett suffered from lupus and bipolar disorder.

199. Nurse Hay also took Ms. Hanchett's vital signs. Her blood pressure (143/89) and pulse (120 BPM) were both elevated. Nurse Hay did not, however, take any steps to address these concerning vital signs.

200. Nurse Hay later charted that Ms. Hanchett had been "uncooperative" during processing and that she'd been unable "to complete [intake] at this time." However, in a written report, Officer David Owen notes that Ms. Hanchett "appears to cooperate with officers while being processed as a new inmate."

201. After failing to complete the intake process, Jail staff locked Ms. Hanchett in processing cell B130 – a tiny, cockroach-infested cell that had no sink, no toilet and no bed. For the next 11 days, she was confined in these conditions and deprived of virtually all human contact. The lights were left on at all times, day and night, depriving her of any sleep.

202. For periods of up to 5 days at a time, no one at the Jail even opened the door of Ms.

Hanchett's cell. Denied access to a toilet, she was forced to urinate on the floor and then lie in her own waste.

203.   Despite the absence of a sink in her cell, no one at the Jail provided her with water or other hydration, day after day after day.

204.   Throughout this time, the Jail and Turn Key staff were fully aware of Ms. Hanchett's dreadful conditions of confinement and her escalating mental health crisis.

205.   Ms. Hanchett's cell was video monitored, allowing Jail staff to clearly see her extreme distress, her erratic behavior, and the rotting food, trash, and human waste on the floor of her cell.  Despite observing that Ms. Hanchett had not been adequately eating and had been given nothing to drink for days, they failed to address these dangerous health risks or report them to a physician. This constitutes deliberate indifference, reckless neglect and inhumane mistreatment across the board. Indeed, Ms. Hanchett was shown *nothing but* indifference during her time at the Cleveland County Jail.

206.   After 12 unspeakably horrific days at the Cleveland County Jail, Ms. Hanchett died.

207.   The Medical Examiner's office determined Ms. Hanchett died of heart failure. Other significant conditions contributing to her death were psychosis with auditory and visual hallucinations and severe dehydration.

208.   On information and belief, Ms. Hanchett's death would not have occurred in the absence of her prolonged catatonia and severe dehydration.

209.   Ms. Hanchett was just 38 years old when she died.

210.   On December 20, 2022, less than two weeks after Ms. Hanchett died, another inmate at the Cleveland County Jail, Kathryn Milano, passed away.

211.  In February 2023, Joe Allen Sims, Jr., a mentally ill inmate who was supposed to be under "critical watch," died by suicide at the Cleveland County Jail.

212.  Mr. Sims was discovered by Jail staff 77 minutes after he hanged himself, despite the fact that he was supposed to be closely monitored due to his mental state.

213.  Upon information and belief, Ms. Milano had an extensive history of medical and mental health issues that were poorly controlled while she was housed at the Jail, consistent with the Jail's and Turn Key's policies and practices as discussed, *supra.*

214.  On August 10, 2023, Montoya Holmes was booked into the Tulsa County Jail.

215.  Ms. Holmes suffered from serious asthma and required an inhaler, facts she told Turn Key staff during her booking.

216.  During booking, Ms. Holmes told Turn Key officials her last doses of her asthma medicine were the previous day, August 9, 2023, and that it was imperative that she receive her asthma medicine and inhaler immediately.

217.  Inexplicably, Turn Key officials ignored Ms. Holmes urgent pleas for her asthma medication.

218.  Ms. Holmes was in obvious medical distress, showing symptoms such as shortness of breath, fatigue, and chest pain, yet Turn Key officials ignored her emergent medical condition.

219.  On August 11, 2023 at around 5:00 p.m., Ms. Holmes was found unresponsive in her cell.

220.  She was transported by EMSA to St. John, but she tragically passed away. Upon information and belief, Ms. Holmes died due to heart problems caused by her asthma.

221. On July 22, 2022, William Wimbley, a 64-year-old man, was booked into the McCurtain County Jail another facility that relied on Turn Key to provide medical services to its inmates.

222. Mr. Wimbley informed Turn Key staff he suffered from multiple pre-existing cardiovascular problems including chronic hypertension and was prescribed several medications to treat these pre-existing conditions.

223. For months, Mr. Wimbley complained that the McCurtain County Jail and Turn Key Staff were not properly controlling his blood pressure, but his pleas were ignored.

224. On January 7, 2023, Mr. Wimbley experienced severe chest pains and was taken to a hospital where his blood pressure was measured at 226/124, which is an extreme and potentially deadly state of hypertension.

225. Mr. Wimbley was stabilized and then returned to the McCurtain County Jail with discharge instructions that the jail adjust his medications to better control his hypertension and further instructions that Mr. Wimbley should follow up with a physician within 1-2 days and if his symptoms worsened, he should return to the ER.

226. Two days later January 9, 2023, at the McCurtain County Jail, Mr. Wimbley again experienced chest pain and was in another hypertensive crisis with his blood pressure measured at 186/121. Jailer Brittany Stockton called Turn Key APRN Becky Pata to inform her of Mr. Wimbley's condition.

227. Contrary to the discharge instructions from the hospital, Mr. Wimbley was not taken back to the hospital or seen by a physician. Instead, Nurse Pata instructed jail staff to give .2mg of Clonidine and to do nothing further.

228. For weeks, Mr. Wimbley's blood pressure was measured at levels consistent with a hypertensive crisis, but no steps were taken by the jail or Turn Key staff have Mr. Wimbley see a physician, return him to a hospital, or modify his treatment. Mr. Wimbley continued to experience chest pains and dangerous hypertension due to the jail and Turn Key's inaction.

229. In early March 2023, Mr. Wimbley reported to both jail and Turn Key staff that he developed weakness and numbness in his left side, fatigue and additional pain.

230. Throughout March 2023, Mr. Wimbley's health continued to deteriorate, and he pled to jail and Turn Key staff daily to be taken to the hospital but again and again his pleas for help were ignored.

231. At the end of March/beginning of April 2023, Mr. Wimbley's condition severely worsened. He reported to jail and Turn Key staff that his left side weakness and numbness had gotten even worse, to the point that he struggled to walk. This too was ignored by jail and Turn Key staff.

232. On April 5, 2023, Mr. Wimbley's condition deteriorated to the point that he lost control of his bowels and bladder and after months of indifference to Mr. Wimbley's suffering the jail and Turn Key staff finally sent Mr. Wimbley to a local hospital where it was determined he had suffered a stroke. Eventually, Mr. Wimbley had to be life-flighted to OU Medical Center for additional treatment.

233. In late April 2023, Mr. Wimbley was transferred to a rehabilitation hospital for several grueling weeks of physical therapy in an effort to restore strength and mobility to his left side.

234.    Mr. Wimbley brought suit, pursuant to § 1983, against the McCurtain County Jail Trust, McCurtain County Board of County Commissioners ("BOCC"), and Turn Key. *See Wimbley v. McCurtain County Jail Trust, et al.,* Case No. 25-CV-78-RAW-GLJ (E.D. Okla.). On August 29, 2025, Magistrate Judge Gerald Jackson issued a Report and Recommendation denying Defendants Turn Key's and BOCC's motions to dismiss. In recommending the denial of Turn Key's motion to dismiss, Magistrate Judge Jackson held, in pertinent part, that Mr. Wimbley's "allegations sufficiently support an inference that [Mr. Wimbley] was denied medical care for his serious medical condition due to an official policy or custom..." *Wimbley v. McCurtain County Jail Trust, et al.,* Case No. 25-CV-78-RAW-GLJ, at Doc. No. 36, p. 12.

235.    On February 19, 2022, China Bradley was booked into the Tulsa County Jail.

236.    Ms. Bradley was 24 years old and suffered from paranoid schizophrenia, bipolar disorder, anxiety, and dissociative identity disorder. Turn Key obtained her mental health records and prescription information.

237.    Three days after Ms. Bradley was booked into jail Turn Key started giving her Paroxetine and Aripiprazole, the mental health medications she was prescribed.

238.    Ms. Bradley was evaluated by multiple Turn Key employees who noted Ms. Bradley was suffering from many mental health related symptoms including delusions, hearing "voices," speaking to people/entities that were not there, and believing she was a male that was related to China Bradley.

239.    On March 22, 2022, Ms. Bradley was taken off Paroxetine and Aripiprazole and started on Risperidone, another drug that treats bipolar disorder and schizophrenia.

240. By July 22, 2022, Ms. Bradley's already clearly poor mental state further deteriorated. She remained in her bed for most of every day and night, rarely went out for recreation time, and kept her cell in an unsanitary condition, with food, trash, and papers strewn around her cell.

241. On July 26, 2022, Ms. Bradley began taking an additional mental health medication, Lexapro.

242. Ms. Bradley's condition continued to decline. On October 26, 2022, she was put on suicide watch. Ms. Bradley presented with delusions and flight of ideas which are symptoms associated with manic episodes and psychotic states.

243. On December 7, 2022, Turn Key provider Judy Wagga observed Ms. Bradley trembling and Ms. Bradley was started on Benztropine Mesylate, a medication used to treat Parkinson's Disease.

244. On or about December 16, 2022, Ms. Bradley reported that she felt sick and was throwing up. Additionally, a Turn Key licensed professional counselor noticed Ms. Bradley moved her mattress to the floor of her cell.

245. Over the next couple of days Ms. Bradley experienced symptoms of a serious medical condition including feeling faint/fatigued and her vision would randomly become blurry.

246. Ms. Bradley also stopped eating regularly and spent almost every minute of the day lying naked on the floor of her cell, rarely responding to anyone instead responding primarily to internal stimuli.

247. On December 21, 2022, Ms. Bradley, still experiencing these symptoms, fell in the showed and developed a golf ball-sized "goose egg" on her forehead. She was not sent to the hospital or seen by a physician. Ms. Bradley's psychotic symptoms worsened, and she refused or was unable to engage with mental health professionals. From then on Ms. Bradley experienced great difficulty walking or standing by herself without falling.

248. On December 23, 2022, Ms. Bradley, likely after another fall, was found lying on the floor of her cell unresponsive with no pupil response and bleeding from her left eye. Two hours after being found she was transported to the emergency room.

249. At the emergency room, blood tests showed Ms. Bradley was suffering from a buildup of lactic acid in her blood and severe potassium deficiency which can cause severe muscle weakness, low blood pressure, lightheadedness or faintness, abnormal heart rhythms, or even respiratory failure.

250. Ms. Bradley was treated with IV fluids and discharged from the hospital the next day. Upon discharge her discharge, emergency room providers warned that if Ms. Bradley experienced new or worsening symptoms, she should return to the ER immediately for further care.

251. After Ms. Bradley returned to the jail where Turn Key APRN Judy Wagga, who was not onsite, ordered injections of Haldol and Benadryl which slowed Ms. Bradley's breathing. Both medications were inappropriate and unnecessary. Haldol was especially dangerous because it is contraindicated for those at risk for certain heart problems, including people with low potassium like Ms. Bradley.

252. Throughout December 24 and 25, 2022, multiple Turn Key providers saw Ms.

Bradley lying naked on the floor of her cell, unable to stand or walk, unresponsive to verbal stimuli and with deliberate indifference to her serious medical needs left her.

253. At approximately 5:00 p.m. on December 25, 2022, Turn Key nurse Lyric Brooks, LPN encountered Ms. Bradley during pill pass. Nurse Brooks observed Ms. Bradley in the same emergent state she'd been in for the previous several hours and days: lying naked on the floor of her cell not responsive to verbal stimuli. By this point, Ms. Bradley had been lying naked on the floor of her cell, catatonic, for the approximately 28 hours, ignored by the few members of the Jail and Jail medical personnel who were staffed on Christmas, despite her obviously emergent medical and mental health conditions.

254. Nurse Brooks called a Turn Key Charge Nurse to notify them about Ms. Bradley's obviously emergent condition. The Charge Nurse responded that Ms. Bradley's condition was normal and she'd been in that same state since she returned from St. John.

255. Both Nurse Brooks and a TCSO deputy told the Charge Nurse that Ms. Bradley's condition was *not* normal based on their knowledge of Ms. Bradley's typical state and demeanor from previous interactions with her at the Jail.

256. Upon information and belief, the Charge Nurse reluctantly came to Ms. Bradley's cell to "assess" her and brushed off Nurse Brooks' and the deputy's concern, callously stating that Ms. Bradley was fine.

257. Still alarmed at Ms. Bradley's obviously dire condition, Nurse Brooks tried to get in contact with someone in the Mental Health department at the Jail, but no one answered due to the understaffing on Christmas.

258. At 7:30 p.m. on December 25, 2022, Ms. Bradley was unresponsive to even a sternal

rub. A nurse was called to her cell where it was observed that Ms. Bradley's respirations were shallow and she was clearly near death.

259.   An ambulance was called to take Ms. Bradley to the hospital where she was later pronounced dead at the age of 25.

260.   On June 19, 2022, 78-year-old Wade Womack was arrested and taken to the Canadian County Jail.

261.   Mr. Womack had a history of hypertension, kidney failure, and congestive heart failure which required him to have 13 stents and be on three different blood thinners. His medical history was reported during his intake and later confirmed by medical records sent to Turn Key.

262.   At the Canadian County Jail, Mr. Womack had pain and weakness throughout his body which caused him to fall multiple times and develop cuts and bruises across his body.

263.   Mr. Womack also had trouble swallowing, which made it difficult for him to take medications and prevented him eating and drinking proper amounts.

264.   On June 26, 2022, Mr. Womack complained of sharp stabbing pain in the left side of his chest and was seen by only an LPN. Subsequently, he was not given any meaningful treatment, sent to a hospital, nor was Mr. Womack seen by a physician or even a registered nurse.

265.   Upon information and belief, on July 3, 2022, an APRN placed an over the phone order instructing Jail medical staff to give Mr. Womack a nutritional shake twice per day, to crush his medication, and place him on a soft diet due to his issues chewing and swallowing. No further treatment was ordered, no appointment with a physician was scheduled, and no

medical provider with more training than an LPN came to assess Mr. Womack.

266.   On July 6, 2022, the Canadian County District Court held a hearing regarding the State's Motion to Hold Without Bond in Mr. Womack's pending criminal case.

267.   At the hearing, Nurse Tina Hunt, LPN testified that between the time Mr. Womack was booked at the Jail and the date of the hearing, she had seen or treated Mr. Womack six or seven times.

268.   When asked *if the jail had "the necessary resources to house [Mr. Womack] and treat him for his condition," Nurse Hunt testified "No, ma'am."*

269.   Nurse Hunt further added that Mr. Womack had lots of open wounds and bruises that were not present before he was booked into the Jail and that Mr. Womack required "immediate medical care" and that he required care at a "long-term care facility."

270.   Captain Austin Moore, Deputy Jail Administrator of the Canadian County Jail, was also called as a witness at the same hearing. He testified that detention staff regularly had to assist Mr. Womack with basic activities such as getting him into his wheelchair, dressing him, helping him get to the toilet, and putting his adult diapers on.

271.   When asked if the Jail had the necessary resources to address Mr. Womack's serious medical conditions, Captain responded, "As far as full care, that is the recommendations of what Turn Key -- which is who we contract with as the jail to provide medical aid to the inmates -- *the recommendation is he needs full care. We don't have that ability."*

272.   In her closing at the hearing, Mr. Womack's criminal defense attorney stated: "this is a hearing for [Mr. Womack's] bond, and as he stands right now, the charges don't carry the death penalty. However, *this 78-year-old man, if left in the custody of the Canadian*

*County jail, due to his deteriorating health and the facility not being able to assist him with*
*the treatment that he needs, he will die."*

273. The request for medical OR bond was denied, and Mr. Womack was returned to the Canadian County Jail where his condition continued to worsen and the low level of care he received remained the same. No member of the Jail or Jail medical staff arranged for Mr. Womack to be seen by a physician, PA, APRN, or RN.

274. In the early hours of July 7, 2022, the day after the hearing, Mr. Womack was found in cardiac arrest in his cell. After being transported to the hospital, he was pronounced dead.

275. Mr. Womack's Estate brought claims, pursuant to 42 U.S.C. § 1983, against the Sheriff of Canadian County, Turn Key, and three Turn Key nurses, Sally Miller, LPN, Ave Giovinco, LPN, and Tina Hunt, LPN, who were tasked with caring for Mr. Womack while he was housed at the Canadian County Jail.

276. On February 20, 2025, Judge Patrick Wyrick accepted the Magistrate Judge's recommendation to deny Turn Key, Nurse Miller, Nurse Giovinco, and Nurse Hunt's motions to dismiss. *See Neal v. Sheriff of Canadian County,* 2025 WL 561420 (W.D. Okla. Feb. 20, 2025).

277. In denying the motions to dismiss, Judge Wyrick held, found, and reasoned, in pertinent part:

> Plaintiff set forth ample facts asserting that Turn Key had a policy or custom of under staffing, under training, and under supervising, all driven by its cost-saving incentives. Specifically, Plaintiff alleges that in order to boost profits, Turn Key had a policy of under staffing its facilities such that it was impossible for the few physicians employed by Turn Key to supervise or provide required medical care to inmates within their care, leaving this responsibility to unqualified and under trained medical personnel...Plaintiff pleaded facts

beyond Turn Key's desire to make a profit. Plaintiff pleaded sufficient facts to establish the first element of *Monell* liability.

Moving to causation, Plaintiff has set forth facts demonstrating that Mr. Womack was solely cared for by LPNs employed by Turn Key who knew of his medical conditions, his medical history, his inability to take his required medications, and his rapidly deteriorating condition, but despite this knowledge, none of Turn Key's employees abided by their obligation to notify a physician or medical provider with more training of Mr. Womack's situation. Further, none of Turn Key's employees arranged for Mr. Womack to be evaluated by a physician or taken to a hospital for treatment. And along with these allegations, Plaintiff has set forth facts plausibly suggesting that it was *because* of Turn Key's cost-cutting measures and policies to under train, under supervise, and under staff that this outcome resulted. Plaintiff has satisfied her burden of setting forth facts that plausibly suggest that Turn Key's policies caused Mr. Womack's injuries.

*Neal v. Sheriff of Canadian County,* 2025 WL 561420, at *8-9 (W.D. Okla. Feb. 20, 2025).

278.   In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates.  And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

279.   By its design, the Turn Key medical system was destined to fail.

280.   At all pertinent times, Dr. William Cooper, D.O., was the "Medical Director" for Turn Key.  In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

281.   In essence, Turn Key employs a small number of mid-level providers, such as

physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to each of jails for short blocks of time. This constitutes plainly insufficient medical staffing.

282. With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their licensure and training.

283. In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Cleveland County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Mr. Griego, with complex and serious medical needs, including relating to chronic asthma with severe acute attacks

284. With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

285. This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical conditions, like Mr. Griego, at substantial risk of harm.

286. This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

287. CCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Mr. Griego at excessive risk of harm. However, CCSO and the County failed to alleviate the

known and obvious risks in deliberate indifference to the rights of inmates like Mr. Griego.

288.    Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

289.    This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

290.    CCSO/the County are aware, or should be aware, of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates, yet CCSO/the County have made the conscious decision to retain Turn Key as the Canadian County Jail's medical provider.

291.    Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Mr. Griego.

292.    There is an affirmative link between the aforementioned unconstitutional acts and/or omissions of Turn Key staff and policies, practices and/or customs which Turn Key promulgated, created, implemented and/or possessed responsibility for.

293.    It was obvious that Mr. Griego's serious and worsening condition required emergency intervention.  Yet, despite the obvious and excessive risks to his health and safety, the Jail and Turn Key employees/agents referenced above ignored Mr. Griego.

294.    Even if no single Turn Key employee/agent had violated Mr. Griego's constitutional rights, Turn Key would still be liable under a theory of a systemic failure of its policies and

procedures as described herein.  There were such gross deficiencies in the medical delivery system at the Jail that Mr. Griego was effectively denied constitutional medical care.

295.   In addition, CCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Mr. Griego, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

■   **Sheriff/CCSO/ County's Custom of Inadequate Medical Care**

296.   Counties may be held liable for the maintenance of an unconstitutional health care delivery system.  In *Burke v. Regalado*, 935 F.3d 960 (10th Cir. 2019), the Tenth Circuit upheld a jury verdict against the Tulsa County Sheriff for his failure to supervise based on evidence that he maintained a policy or custom of insufficient medical resources and training, chronic delays in care and indifference toward medical needs at the Tulsa County Jail.  *See Burke,* 935 F.3d at 999-1001.[6]

297.   As evidenced, *supra,* the Jail/CCSO/the County have maintained an unconstitutional health care delivery system.

298.   Indeed, by simply retaining Turn Key as the medical provider at the Jail in light of the obviously substandard care that Turn Key has provided – and continues to provide – to inmates at the Cleveland County Jail and county jails all over Oklahoma, Arkansas, and

---

[6]      *See also v. Crowson v. Washington Cty. Utah,* 983 F.3d 1166, 1192 (10th Cir. 2020) (finding that a county may face liability based on "theory [of] systemic failure of medical policies and procedures"); *Burke v. Glanz,* No. 11-CV-720-JED-PJC, 2016 WL 3951364, at *23 (N.D. Okla. July 20, 2016) ("[B]ased on the record evidence construed in plaintiff's favor, a reasonable jury could find that, in the years prior to Mr. Williams's death in 2011, then-Sheriff Glanz was responsible for knowingly continuing the operation of a ***policy or established practice of providing constitutionally deficient medical care*** in deliberate indifference to the serious medical needs of Jail inmates like Mr. Williams.").

Kansas, CCSO/the County are deliberately indifferent to inmates' serious medical needs.

299.    In addition, CCSO has utterly failed to train its detention staff in how to properly monitor, supervise, or care for inmates, like Mr. Griego, with complex or serious medical and mental health needs, with deliberate indifference to the health and safety of those inmates.

300.    During the eight (8) days Mr. Griego was at the Jail after returning from NRH on November 16, 2023, dozens of jailers watched him deteriorate until he was on the edge of death. They knew he had severe and untreated mental illness. They knew that he had just returned from the hospital after suffering a collapsed lung. It was obvious that he stopped getting up off his bunk, stopping being able to speak coherently, began defecating on himself, and became unable to eat. Throughout these eight days, they saw and demonstrated deliberate indifference continually.  Not one of them called an ambulance.  Not one of them showed any indication that they saw any problem with how he was treated.  The Jail has a deeply entrenched custom and practice of deliberate indifference.

301.    An inspection conducted by the Oklahoma State Department of Health's Jail Inspection Division ("JID") in March 2023 revealed that jailers had missed numerous cite checks on inmates, including inmates who were supposed to be under critical watch, in December 2022 and January 2023. One of those inmates who jailers failed to adequately monitor was Shannon Hanchett, discussed, *supra*. Logs revealed that detainees who were supposed to be closely monitored were left alone and unsupervised for up to 45 minutes at a time on December 5 and 6, 2022.

302.    An inspection in May of 2022 revealed that detention officers missed dozens of 15-

minute checks required for detainees under suicide watch at the Jail.

303.   In one case, the report shows that jailers missed 50 of 73 checks needed over 18 hours for a detainee deemed a suicide risk.

304.   The report also revealed that jailers missed dozens of other checks on inmates who were not on a heightened monitoring schedule.

305.   Yet, upon information and belief, CCSO/the County failed to ensure that the Jail was properly staffed, jailers were adequately trained, and that jailers conducted their required checks, especially on inmates, like Mr. Griego, who had serious medical/mental health needs and/or required close monitoring.

306.   In March 2023, the Board of County Commissioners of Cleveland County approved a plan to increase medical and mental health staff at the Jail following the deaths of Ms. Hanchett, Ms. Milano, and Mr. Sims.

307.   County Commissioner Rod Cleveland said that the move *was not a response to the deaths of Hanchett, Milano, and Sims, but rather to the Jail's growing population.*

308.   In 2022, the Jail's average daily population was 541 detainees compared to 367 three years earlier, according to reports from Turn Key.

309.   Medical staff reported that there were twice as many sick calls and twice as many mental health needs in 2022 compared to 2019, but during that time period, the County took no steps to increase detention or medical staffing at the Jail.

310.   The County/BOCC/CCSO have had abundant opportunity to increase funding, supervision and training which would allow it to properly staff and address the systemic deficiencies, including severe deficiencies in its medical delivery system, that have plagued

51

the Jail in recent years. Its failure to do so has resulted in injury to multiple detainees, including Mr. Griego. Its failure to take reasonable measures to alleviate known and substantial risks to inmates like Mr. Griego constitutes deliberate indifference at the municipal level.

## CAUSES OF ACTION

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES
### (42 U.S.C. § 1983)

311.  Paragraphs 1-310 are incorporated herein by reference.

### A.    Underlying Violations of Constitutional Rights/Individual Liability

312.    The CCSO/Turn Key staff, described above, knew there was a strong likelihood that Mr. Griego was in danger of serious harm.

313.    As described *supra*, Mr. Griego had serious, emergent, and ongoing medical issues that were known and obvious to the Turn Key/CCSO employees/agents. It was obvious that Mr. Griego needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed. Turn Key/CCSO employees/agents disregarded the known, obvious and substantial risks to Mr. Griego's health and safety.

314.    Over a span of eight (8) days, Mr. Griego was encountered by numerous Jail and Turn Key employees/agents who witnessed his dire and worsening state, but not one of them did a single thing for Mr. Griego despite his and his cellmate's pleas until it was too late.

315.    As a direct and proximate result of this deliberate indifference, as described above, Mr. Griego experienced unnecessary physical pain, a worsening of his conditions, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror,

degradation, oppression, humiliation, embarrassment, and death.

316.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

### B.    Municipal/"*Monell*" Liability (Against Turn Key)[7]

317.    Paragraphs 1-316 are incorporated herein by reference.

318.    Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[8]

319.    At all times pertinent hereto, Turn Key was acting under color of State law.

320.    Turn Key has been endowed by Cleveland County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

321.    Turn Key is charged with implementing and assisting in developing the policies of CCSO with respect to the medical and mental health care of inmates at the Cleveland County Jail and has shared responsibility to adequately train and supervise its employees.

---

[7]    "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694 (1977), 98 S.Ct. 2018], *or* for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz,* 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus he need not establish that Turn Key had final policymaking authority for Cleveland County.

[8]    "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to* <u>*private*</u> *§ 1983 defendants.*" *Dubbs v. Head Start, Inc.,* 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am.,* 175 F. App'x 943, 946 (10th Cir. 2005).

322.    In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

323.    There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Mr. Griego's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

324.    To the extent that no single officer or professional violated Mr. Griego's constitutional rights, Turn Key is still liable under a theory of a systemic failure of policies and procedures as described herein. There were such gross deficiencies in medical procedures, staffing and facilities and procedures that Mr. Griego was effectively denied constitutional conditions of confinement.

325.    Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Griego. Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Mr. Griego's, serious medical needs.

326.    Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

327.    Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the Cleveland County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

328.    There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Mr. Griego's injuries and damages as alleged herein.

### C.    Official Capacity Liability (Against Sheriff of Cleveland County)

329.    Paragraphs 1-328 are incorporated herein by reference.

330.    The aforementioned acts and/or omissions of CCSO and/or Turn Key staff in being deliberately indifferent to Mr. Griego's health and safety and violating Mr. Griego's civil rights are causally connected with customs, practices, and policies which the County/CCSO promulgated, created, implemented and/or possessed responsibility for.

331.    Such policies, customs and/or practices are specifically set forth, *supra.*

332.    The County/CCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Mr. Griego's, health and safety.

333.    The County/CCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

334.    As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Griego suffered injuries and damages as alleged herein.

335.    As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

**WHEREFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

SMOLEN & ROYTMAN

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
701 S. Cincinnati Avenue
Muskogee, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F

*Attorneys for Plaintiff*