UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA

LENA MORALEZ,                          )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        Case No. CIV-25-1389-R
                                       )
TURN KEY HEALTH CLINICS LLC.,          )
and SHERIFF OF CLEVELAND               )
COUNTY,                                )
                                       )
            Defendants.                )

ORDER

Before the Court are the Motions to Dismiss filed by Defendants Turn Key Health

Clinics, LLC [Doc. No. 9] and Sheriff of Cleveland County [Doc. No. 6]. Both motions

are fully briefed and at issue.

BACKGROUND[1]

The facts as alleged are as follows: decedent Mr. Frank Griego was booked into the

Cleveland County Jail on or around October 30, 2023 [Compl., Doc. No. 1, ¶ 8]. Griego

suffered from mental illnesses like schizophrenia, and Plaintiff alleges Griego showed

signs of mental illness during his medical intake screening by Turn Key Emergency

Medical Technician Kayley French. *Id.* ¶¶ 10-12. French ignored these signs of illness and

placed Griego in the Jail's general population, where, likely due to his mental illness, other

inmates assaulted him during the next two weeks. *Id.* ¶¶ 13-14.

---

[1] When reviewing a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of
Civil Procedure, the Court "take[s] the facts in the complaint as true . . . and [ ] views such
facts in the light most favorable to the plaintiff[.]" *Knellinger v. Young*, 134 F.4th 1034,
1042 (10th Cir. 2025) (internal citations and quotation marks omitted).

The worst assault occurred on or about November 13, 2023, when Mr. Griego's cellmate attacked him in his sleep, leaving him in severe pain with cuts, bruises, and a forehead laceration. *Id.* ¶ 15. A Jail guard noticed[2] Griego's injuries and took him to the medical unit, where Turn Key employee Taylor Adams assessed him at about 7:00 p.m. on November 13. *Id.* ¶¶ 16-17. Griego informed Adams he had been attacked multiple times and his cellmate had dragged him from his bunk, slammed him to the ground multiple times, and punched him. *Id.* ¶ 17. Adams noticed evidence of both older and fresh wounds on Griego, as well as his un-dilated pupils, which indicated he might have a concussion. *Id.* ¶¶ 18-19. Griego was thereafter transported to Norman Regional Hospital, where he was diagnosed with multiple fractured ribs, a nasal bone fracture, acute kidney failure, anemia, a vertebra fracture, and a collapsed lung. *Id.* ¶¶ 20, 22. NRH providers noted Griego had not been receiving schizophrenia treatment. *Id.* ¶ 23.

On November 15, 2023, still at the hospital, Mr. Griego showed signs of infection: a fever (100.3°), elevated pulse and blood pressure (103 bpm and 130/86), and diarrhea. *Id.* ¶ 25. On November 16, 2023, he was discharged. *Id.* ¶ 26. His discharge instructions stated:

- his collapsed lung would likely take one to two weeks to heal;

- he needed daily/as-needed application of dressings on his chest for drainage;

- he should rest and avoid activity that caused pain or could injure his chest; and

- he should call a doctor or return to the ER immediately if he experienced (1) sharp, sudden chest pain that worsened with coughing or deep breathing, (2) sudden breathing problems, (3) tightness in the chest, (4) blush color of the skin, or (5) lightheadedness or fainting.

---

[2] The Complaint indicates the Jail guard noticed Griego's injuries on November 14, but that Griego was assessed and transported to the hospital on November 13.

*Id.* ¶¶ 26-29.

Mr. Griego returned to the Jail on November 16, 2023. *Id.* ¶ 30. Turn Key employee Nicole Musgrove scanned the records of his NRH hospital stay into the Jail/Turn Key's system the morning of November 17, 2023. *Id.* Griego allegedly did not receive another medical intake once he returned to the Jail, contrary to Jail and Turn Key Policy. *Id.* ¶ 32. EMT French entered a note on Griego's chart, recording his aforementioned vitals from NRH, the presence of wounds on his face and finger, and that Griego was prone to picking his wound-dressings. *Id.* ¶ 33. This wound-picking was due to his mental illness and increased his risk of infection. *Id.* ¶ 31.

Mr. Griego was placed back into the Jail's general population, but Turn Key failed to closely monitor him or give him any medications for his mental illness or medical conditions. *Id.* ¶¶ 34-35. After November 16, Griego's condition worsened, but Jail and Turn Key staff ignored it. *Id.* ¶ 36. Despite Griego often picking at his wounds and the NRH discharge instructions, his bandages were not changed. *Id.* ¶ 37. He received no medical treatment or assessment from November 16-22 ("The Week"), and spent those days laying on his cell floor, barely moving, eating, or drinking. *Id.* ¶¶ 38-39. He became incontinent and spent much of The Week laying in his own waste. *Id.* ¶ 42. His infection worsened, he contracted pneumonia, and he experienced sharp chest pain, tightness in his chest, lightheadedness, and troubled breathing. *Id.* ¶¶ 39-40. Both Griego and his cellmate repeatedly alerted Jail and Turn Key staff to his worsening condition, but Griego did not

receive medical assessment or treatment, nor (as the NRH discharge instructions counseled) was he returned to the hospital. *Id.* ¶ 41.

By November 18, Mr. Griego had stopped speaking, his breathing was obviously labored, and he could not get up on his own. *Id.* ¶ 43. Continued efforts by Griego's cellmate to get help from Turn Key or Jail staff were unavailing. *Id.* ¶ 43. On November 23, 2023, Griego's condition further declined, but his cellmate's attempts to get him medical attention failed. *Id.* ¶ 44. At around 6:00 pm on November 23, Turn Key nurse Natasha Kairu, LPN, responded to the cellmate and went to Griego's cell, where the cellmate told her about Griego's experience during The Week. *Id.* ¶ 45.

Kairu assessed Mr. Griego and found (1) his pupils were pinpoint, (2) his blood pressure was dangerously low at 90/60, (3) his temperature was 101.4º, (4) his breathing was clearly labored, (5) he wore a blank stare, and (6) he had defecated on himself. *Id.* ¶¶ 46-47. Griego went into cardiac arrest and Kairu had a jailer call an ambulance. *Id.* ¶ 48. EMTs arrived, intubated Griego, and performed CPR. *Id.* They revived him en route to NRH and took him to the ER. *Id.* Griego was diagnosed with (1) sepsis due to streptococcus bacteria, (2) a bilateral pulmonary emboli, (3) acute kidney injury, (4) anemia, (5) a problem with pulmonary contusions, and (6) multiple rib fractures. *Id.* ¶ 49. Griego lost his pulse several times while at NRH until November 25, 2023, when he was pronounced dead. *Id.* ¶¶ 50-51. The Medical Examiner determined his likely cause of death as complications due to his pulmonary emboli. *Id.* ¶ 52.

Plaintiff Lena Moralez brought this action as Administrator of Frank Griego's Estate. She contends that the failure to provide Griego with medical care despite his

ongoing complaints and his obvious serious medical conditions violated his Fourteenth Amendment right to receive adequate medical attention while incarcerated as a pretrial detainee. She asserts claims for municipal liability pursuant to 42 U.S.C. § 1983 against Turn Key and the Sheriff, alleging their deliberately indifferent policies, customs, training, and/or supervision were the moving forces behind the violation of Griego's constitutional rights. Both Turn Key and the Sheriff have moved to dismiss the Complaint.

**LEGAL STANDARD**

Dismissal under Rule 12(b)(6) is proper when a complaint fails "to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). "To survive a Rule 12(b)(6) motion, the complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Brown v. City of Tulsa*, 124 F.4th 1251, 1263 (10th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). And while the Court "must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor, the plaintiff still 'must nudge the claim across the line from conceivable or speculative to plausible.'" *Id.* (quoting *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021)). "Mere 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action' will not suffice." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

5

## DISCUSSION

### I.   Legal Framework

### a.  Deliberate Indifference to Serious Medical Needs

To recover under § 1983, a plaintiff must establish that a person acting under color of state law "violated his constitutional or statutory rights." *Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010). Plaintiff claims Defendants violated Mr. Griego's constitutional rights by acting with deliberate indifference to his serious medical needs. "[A] prison official's deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment." *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022). A pretrial detainee such as Mr. Griego[3] is "entitled to the same standard of medical care under the Due Process Clause of the Fourteenth Amendment." *Id.*

The deliberate indifference standard "contains both an objective and subjective component." *Lucas v. Turn Key Health Clinics, LLC*, 58 F.4th 1127, 1136 (10th Cir. 2023). "The objective component examines whether the medical condition or harm claimed by the inmate was 'sufficiently serious[.]'" *Prince*, 28 F.4th at 1044 (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009)). "[A] medical need is considered sufficiently serious if the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001) (internal quotation

---

[3] Neither Turn Key nor the Sheriff dispute Griego's status as a pretrial detainee.

6

marks and ellipses omitted). "Deliberate indifference toward an inmate's risk of death certainly satisfies this standard[,]" although "a life-threatening condition" is not required. *Prince*, 28 F.4th at 1044-45 (quotation marks omitted). Further, "[w]here a prisoner claims that harm was caused by a delay in medical treatment, he must show that the delay resulted in substantial harm[,]" which may include "lifelong handicap, permanent loss, or considerable pain." *Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (internal quotation marks omitted).

> The subjective component of the deliberate indifference standard is satisfied if
>
> the official knows of and disregards an excessive risk to inmate health or safety. The official must be aware of the facts from which the inference of a substantial risk of serious harm could be drawn and also draw that inference. A plaintiff need not show that a prison official acted or failed to act believing that harm actually would befall an inmate, but rather that the official merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence such as whether the risk was obvious. An official disregards risk when he fails to take reasonable measures to abate the risk.

*Lucas*, 58 F.4th at 1137 (quotation marks and citations omitted). "A prisoner may satisfy the subjective component by showing that . . . delay in providing medical treatment caused either unnecessary pain or a worsening of [his] condition. Even a brief delay may be unconstitutional." *Mata v. Saiz*, 427 F.3d 745, 755 (10th Cir. 2005).

Medical professionals operating in a prison may also be liable for deliberately indifferent conduct, which can include the failure to treat a serious medical condition properly or a failure to fulfill their role as a gatekeeper for other medical personnel. *Sealock*

*v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). However, the "negligent failure to provide adequate medical care, even one constituting medical malpractice, does not give rise to a constitutional violation." *Self v. Crum*, 439 F.3d 1227, 1233 (10th Cir. 2006) (internal quotation marks omitted).

### b. Municipal Liability

To succeed on a claim under § 1983 against a local government entity,[4] the plaintiff must, in addition to establishing an underlying constitutional violation, prove that (1) a government's official policy or custom (2) caused a constitutional injury and (3) the policy was enacted or maintained with the requisite state of mind. *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013). An official policy or custom may take one of the following forms:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (quotation and alteration marks omitted).

---

[4] Municipal liability "has been extended to private entities acting under color of state law, such as medical contractors." *Lucas*, 58 F.4th at 1144 (quotation omitted).

"To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." *Schneider*, 717 F.3d at 770 (quotation omitted). Put another way, "[t]he policy or custom must be 'the moving force behind the injury alleged.'" *Buchanan v. Turn Key Health Clinics, LLC*, No. 22-7029, 2023 WL 6997404, at *8 (10th Cir. Oct. 24, 2023) (quoting *Schneider*, 717 F.3d at 770) (unpublished).

Last, the requisite state of mind is deliberate indifference. "In the municipal liability context, deliberate indifference is an objective standard." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 n.5 (10th Cir. 1998). The standard "may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Id.* at 1307. Typically, notice is "established by proving the existence of a pattern of tortious conduct." *Id.* However, deliberate indifference may also "be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction." *Id.* (quotation marks and citation omitted).

Additionally, and pertinent to the claims in this case, "municipal liability may exist without individual liability" where there has been a "systemic failure" of policies and procedures that causes a "systemic violation carried out by multiple actors." *Lucas*, 58 F.4th at 1144. Such claims are unusual and "ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Crowson v. Wash. Cnty.*, 983 F.3d 1166, 1191 (10th Cir. 2020). But "[w]here the sum of multiple officers'

9

actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable." *Id.*

## II.    Analysis

### a.  Turn Key's Motion to Dismiss

Turn Key argues Plaintiff has failed to establish an underlying constitutional violation of Mr. Griego's rights because she has not adequately pleaded the subjective component of the deliberate indifference test.[5] According to Turn Key, Plaintiff has not sufficiently alleged any Turn Key employee knew Griego was at substantial risk of harm due to (1) being placed where he could be attacked by other inmates and/or (2) lack of medication for his mental illness. Plaintiff does not specifically address these arguments in her Response, instead stating she

> is not claiming . . . that EMT French's placing Mr. Griego in general population when [he] was first booked into the Jail constitutes a constitutional violation. Rather, Plaintiff is alleging that Jail and Turn Key staff's inadequate medical care given to Mr. Griego, *after* he returned from the hospital on November 16, 2023, violated Mr. Griego's constitutional right to adequate medical care.

[Doc. No. 14, at pp. 8-9]. The Court agrees with Plaintiff. The Complaint's focus is primarily on Griego's lack of medical care during The Week he spent laying on the floor

---

[5] Neither Turn Key nor the Sheriff meaningfully dispute that Plaintiff has adequately pleaded the objective component of the deliberate indifference test. In any event, Mr. Griego's death satisfies the objective component. *Martinez*, 563 F.3d at 1088-89.

of his cell.[6] The Court will thus focus upon whether Turn Key personnel were deliberately indifferent to Griego's serious medical needs during The Week.

Turn Key next contends that with respect to The Week, Plaintiff's (1) failure to allege anything a Turn Key employee specifically did or did not do and (2) collective allegations against "Turn Key and Jail staff" do not "provide adequate notice as to the nature of the claims against" Turn Key pursuant to Federal Rule of Civil Procedure 8. *Robbins v. Oklahoma*, 519 F.3d 1242, 1245-46, 1250 (10th Cir. 2008) (plaintiffs who sued Oklahoma Department of Human Services, various DHS employees, and others did not provide adequate notice of § 1983 claims by using collective term "Defendants" and failing to distinguish which acts were attributable to whom); *see also duBois v. Bd. of Cnty. Comm'rs*, No. 12-CV-677-JED-PJC, 2014 WL 4810332, at *2 (N.D. Okla. Sep. 29, 2014) (quotations omitted) (highlighting the particular importance of clearly alleging who did what to whom in § 1983 cases against a governmental entity and *numerous* state actors).

"[T]he core consideration is notice." *Atchison v. City of Tulsa*, No. 21-CV-286-TCK-SH, 2022 WL 676975, at *7 (N.D. Okla. Mar. 7, 2022) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554-55 (2007)). In *Atchison*, defendants moved to dismiss

---

[6] Indeed, the Complaint includes allegations of other situations wherein inmates suffered harms or death due to being left in their cells despite ever-worsening medical conditions and entreaties for help. Plaintiff asserts each of the cited examples tells of an inmate "with obvious, serious and emergent medical and mental health conditions[ who] was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions." Compl., ¶ 278. Though some of the examples may not be directly analogous to Mr. Griego's case, at this stage they support Plaintiff's argument that the focus of the Complaint is on The Week Griego spent laying on the floor of his cell with no medical attention.

plaintiff's § 1983 complaint because it "impermissibly 'lump[ed] all Defendants together.'" *Id.* The court stated

> Plaintiff's Complaint identifies a limited and well-defined subset of individuals who are alleged to have violated Plaintiff's rights, and it further describes what actions they took. . . . That is all that is required at this stage. Contrary to Defendants' argument that Plaintiffs have engaged in impermissible "lumping," it is well established that a complaint does not fail because it refers to the actions of a small number of defendants as a group.
>
> Defendants . . . are not entitled to dismissal because the Complaint makes the same allegations against each of them. . . . [D]istrict courts in this Circuit have repeatedly refused to dismiss complaints for allegedly improper group pleading. *See, e.g.*, *APMC, Inc. v. Fogarty*, No. CIV-08-249-L, 2008 WL 4279780, at *2 (W.D. Okla. Sep. 12, 2008) (plaintiff meets the pleading standard by identifying specific activities taken within a discrete time frame) [] . . . .
>
> Dismissal for grouping defendants together at the pleading stage is particularly inappropriate because a plaintiff has not yet had the benefit of discovery. *See, e.g.*, *Birdsong v. Unified Gov't of Kan. City*, No. 13-2090-JAR-TJJ, 2014 WL 2216904, at *5 (D. Kan. May 29, 2014) ("[T]o the extent that [defendants] are requesting that Birdsong be required to allege how [defendants] otherwise 'agreed, conspired, and acted in concert to falsely and maliciously prosecute Birdsong, that level of pleading is not required by Rule 8(a)(2). Moreover, it is understandable that Birdsong, prior to discovery, may not have sufficient knowledge or information to provide the specific level of detail requested by [defendants].").

*Id.* at *7-8 (some citations altered and omitted); *see also Scott v. City of Tulsa*, No. 17-CV-400-TCK-CDL, 2022 WL 36879, at *8 (N.D. Okla. Jan. 4, 2022) ("Without discovery, it is not reasonable to expect, nor does the law require, Plaintiffs to identify every specific action each Defendant took.").

There are only two defendants in this case: Turn Key and the Sheriff. Plaintiff has pointed to specific actions (or inactions) of Turn Key and Jail staff (ignoring Griego's and his cellmate's pleas for help, ignoring Griego's condition, failure to follow NRH's

discharge instructions) during a discrete time period (The Week). This is sufficient to place Turn Key on notice of the claims against it. Dismissal is therefore unwarranted under Rule 8, particularly where Plaintiff has not yet had the opportunity for discovery to uncover the identities of Jail or Turn Key staff members who might have been present during The Week.[7]

Turn Key further asserts Plaintiff's failure to identify specific actions taken by specific Turn Key employees during The Week is a failure to plead the subjective component of her deliberate indifference claim. "Because municipalities act through officers, ordinarily there will be a municipal violation only where an individual officer commits a constitutional violation." *Crowson*, 983 F.3d at 1191. However, under the systemic failure theory,

> sometimes the municipal policy devolves responsibility across multiple officers. In those situations, the policies may be unconstitutional precisely because they fail to ensure that any single officer is positioned to prevent the constitutional violation. Where the sum of multiple officers' actions taken pursuant to municipal policy results in a constitutional violation, the municipality may be directly liable. That is, the municipality may not escape liability by acting through twenty hands rather than two.

*Id.*

> Plaintiff alleges Turn Key is liable under a theory of systemic failure.

> Determining whether the systemic failure is itself a constitutional violation that may underlie *Monell* liability is conflated with the *Monell* second step causation analysis, that is, whether the systemic policy failure caused [Mr.

---

[7] *See also Burke v. Regalado*, 935 F.3d 960, 1009-10 (10th Cir. 2019) (citing *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013); *Davis v. Samuels*, 608 F. App'x 46, 48 (3d Cir. 2015); *Geter v. Wille*, 846 F.2d 1352, 1354 (11th Cir. 1988)) (indicating municipal and supervisor liability can be evaluated even where a plaintiff does not name or sue any individual subordinates).

Griego's] constitutional injury. This is the case because the Plaintiff in her briefing argues the same polic[ies] . . . not only form[] the basis of her underlying constitutional violation, but [are] also the very same polic[ies] that underl[y] her *Monell* liability claim based on the actions of [the] Sheriff . . . and Turn Key.

*Lucas*, 58 F.4th at 1144 n.8.

Plaintiff alleges "Turn Key has an established practice of failing to adequately assess and treat—and ignoring and disregarding—obvious or known symptoms of emergent and life-threatening conditions." Compl., ¶ 65. Turn Key also has a "custom of inadequately staffing county jails, including the Cleveland County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate . . . or treat inmates, like Mr. Griego, with complex and serious medical needs." *Id.* ¶ 283. Furthermore, "Turn Key provides inadequate guidance, training and supervision to its medical staff" and "employs a small number of mid-level providers . . . and physicians who travel all over the State" which "constitutes plainly insufficient medical staffing." *Id.* ¶¶ 64, 281. According to Plaintiff, this system is "designed to minimize costs at the expense of inmate care" and is part of Turn Key's policy or custom of reducing "the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin." *Id.* ¶¶ 57, 285. Plaintiff also discusses Turn Key's contract with the Jail, which, due to terms such as those requiring Turn Key to bear certain pharmaceutical and hospitalization costs, creates a "dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, like Mr.

14

Griego, at the Jail and to avoid off-site medical costs."[8] *Id.* ¶¶ 58-63. Plaintiff alleges Turn Key's policies and customs "have resulted in deaths or negative medical outcomes in countless cases in [] Cleveland County" and the state, including Mr. Griego's.[9] *Id.* ¶ 75.

---

[8] The Tenth Circuit has found allegations of cost-cutting policies based solely on the terms of contracts like Turn Key's are insufficient to allege a cost-cutting policy. *Lucas*, 58 F.4th at 1145-46. And even if such allegations were sufficient, failure to plead that any medical staff were motivated by cost in their actions can be fatal to such claims. *Id.* However, courts have found claims of cost-cutting policies based upon (1) the contract, (2) allegations of customs of understaffing, and (3) cited instances of similar past conduct of inadequate care are sufficient to state deliberate indifference claims at the 12(b)(6) stage. *See White v. Bowling*, No. 22-CV-0139-CVE-SH, 2023 WL 3359626, at *4-5 (N.D. Okla. May 10, 2023); *Wimbley v. McCurtain Cnty. Jail Tr.*, No. CIV-25-78-RAW-GLJ, 2025 WL 3190646, at *5 (E.D. Okla. Aug. 29, 2025), *report and recommendation adopted in* 2025 WL 3023408 (E.D. Okla. Oct. 29, 2025) (same); *Callier v. Pottawatomie Cnty. Pub. Safety Ctr. Tr.*, No. CIV-23-594-G, 2024 WL 1340595, at *7 (W.D. Okla. Mar. 5, 2024), *report and recommendation adopted in* 2024 WL 1338155 (W.D. Okla. Mar. 28, 2024) (same).

[9] Moralez specifically alleges Turn Key's customs and failures have caused (1) a Cleveland County inmate's slow death in 2020 from known congestive heart failure, while "employees ignored the obvious and severe worsening of his condition, including extreme edema[,] . . . urinary incontinence, and clear signs of infection," (2) a Cleveland County inmate's death in 2021 after Turn Key employees ignored his pleas for help when he began spitting up blood and disregarded discharge instructions from the hospital counseling his return if his conditions worsened, (3), an inmate's stroke and deteriorated physical condition in 2023 after Turn Key staff ignored his escalating hypertension and chest pain despite hospital instructions to return him to the ER should his symptoms worsen, (4) a 25-year-old inmate's death in 2022 after medical staff ignored her as she lay naked and catatonic on her cell floor for days without treatment or assessment, and (5) an inmate becoming permanently paralyzed in 2019 after medical staff ignored his inability to stand or walk for days until an APRN diagnosed him with stroke-like symptoms. *See* Compl., ¶¶ 76-278 (includes more examples). Though some examples cited by Plaintiff may not be analogous to Griego's case, Plaintiff has, at least at the 12(b)(6) stage, adequately "paint[ed] a plausible picture that Turn Key delays medical care to inmates to reduce financial costs even at the occasional human cost of their inmates' lives." *Estate of Cross, et al. v. Turn Key Health Clinics, LLC, et al.*, 22-CV-3143-SKC-SBP, Doc. No. 60, Order Denying Turn Key's Motion to Dismiss (D. Colo. July 18, 2023).

Turn Key asserts Plaintiff's allegations fail to plead any of Turn Key's customs or practices caused a constitutional deprivation. But various courts in this Circuit have found allegations like Plaintiff's sufficient to allege a deliberate indifference claim against Turn Key. In *Smith v. Bowling*, 20-CV-422-JFH-CDL, 2025 WL 439824, at *2 (N.D. Okla. Feb. 7, 2025), the plaintiff brought a municipal liability claim against Turn Key after he fell off his bunk bed and thereafter could not stand, feed himself, control his urinary function, or move his hands or arms. *Id.* Despite his injuries and complaints to Turn Key, he was not hospitalized until a few days later.[10] *Id.* The court stated:

> *Crowson* distinguished "between claims against a county premised on 'systemic failure' and claims dependent upon a 'predicate violation' by an individual defendant." *Bowlds v. Turn Key Health*, Case No. CIV-19-726-SLP, 2021 WL 354109, at *3 (W.D. Okla. Feb. 2, 2021). Plaintiff states a claim under both theories. He alleges systemic failures in Turn Key's procedures regarding assessment and treatment of emergent medical situations demonstrated by multiple situations within the span of four years where delayed or denied medical treatment allegedly led to permanent injury or death. He also alleges that Turn Key failed to train and supervise its staff . . . regarding treatment of emergent situations. These allegations are sufficient to nudge Plaintiff's municipal liability claim from possible to plausible.

*Id.* at *7 (footnote omitted). *See also Ramirez v. Kay Cnty. Just. Facilities Auth.*, No. CIV-21-00971-JD, 2024 WL 2732300, at *3-4 (W.D. Okla. May 28, 2024) (discussing allegations and examples similar to Plaintiff's and finding them sufficient to show a systemic failure caused the plaintiff's injuries, "to which Turn Key was deliberately indifferent"); *White*, 2023 WL 3359726, at *4 -5 (plaintiff stated a claim for municipal

---

[10] Plaintiff was diagnosed with spinal cord compression and other injuries, spent 30 days recovering, and was left permanently handicapped. *Smith*, 2025 WL 439824, at *2.

liability with allegations that "Turn Key had a custom or policy of maintaining an unconstitutional health care system, including inadequate medical care and staffing, a lack of protective policies, and the prioritization of cost-cutting measures, which resulted in Turn Key's deliberate indifference" to the decedent's medical needs); *Bailey v. Turn Key Health Clinics, LLC*, No. 20-CV-0561-CVE-SH, 2021 WL 4256086, at *6 (N.D. Okla. Sep. 17, 2021) (plaintiff sufficiently stated a deliberate indifference claim against Turn Key where she (1) alleged Turn Key failed to assess plaintiff, who had a serious medical condition, (2) claimed Turn Key had a policy or custom of failing to provide access to trained medical professionals and failing to keep a licensed physician at the jail, (3) cited numerous instances of denied or inadequate medical care at other Turn Key-operated prison medical facilities, and (4) alleged the poor medical care resulted from Turn Key's custom or policy of cutting costs and prioritizing financial gain).

> [Plaintiff's] allegations, taken as true, show that there was a systemic failure, of Turn Key policies or customs, that caused [Griego's] injuries, to which Turn Key was deliberately indifferent. *See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407-08 (1997) ("[T]he existence of a pattern of tortious conduct by inadequately trained employees may tend to show that the lack of proper training . . . is the 'moving force' behind the plaintiff's injury."); *City of Canton v. Harris*, 489 U.S. 378, 390 (1989) ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").

> Thus, [Moralez] has plausibly alleged a constitutional violation and the "three elements" needed "to succeed on a *Monell* claim: '(1) an official policy or custom, (2) causation, and (3) deliberate indifference.'" *Buchanan*, 2023 WL 6997404, at *7 (quoting *Lucas*, 58 F.4th at 1145).

17

*Ramirez*, 2024 WL 2732300, at \*3-4 (footnote omitted and citations altered).[11] Turn Key's

Motion to Dismiss Plaintiff's claims against it is DENIED.

---

[11] And even if Plaintiff had failed to plead a systemic failure, the mere failure to identify specific Turn Key employees who "took part in the alleged unconstitutional acts" is not necessarily fatal to deliberate indifference claims against Turn Key. *Kirkendall-Heller v. Johnson*, No. CIV-21-0011-F, 2021 WL 10366016, at \* 6 (W.D. Okla. July 8, 2021). In *Kirkendall-Heller*, the court rejected a similar argument by Turn Key in its motion to dismiss the *Monell* claim against it:

> Turn Key cites *Monell* to argue that the complaint fails because it does not identify any of Turn Key's employees who took part in the alleged unconstitutional acts. Turn Key contends that without this information, Turn Key's policies and practices cannot have been a moving force behind the alleged constitutional violation. The court disagrees. The fact that Turn Key has no vicarious liability under *Monell* does not entitle Turn Key to judgment when its alleged liability is direct liability for its own policies and practices. . . .
>
> Turn Key argues the complaint fails to allege Gonzalez suffered an underlying constitutional violation at the hands of a Turn Key employee . . . . The premise of this argument is that the subjective component of the deliberate indifference standard is not met with respect to any employee of Turn Key. This premise is rejected. The complaint alleges that Turn Key contracted to assist the jail in classifying inmates with serious mental health needs. It also alleges that Turn Key was complicit in carrying out the policy and practice of picking and choosing which inmates would be provided bed space in the mental health ward. From these allegations it is plausible to infer that Turn Key employees or medical providers, *although not named in the complaint*, classified Gonzalez in a way which resulted in Gonzalez being housed with the general jail population rather than in the mental health ward. The complaint also alleges that Turn Key employees knew Gonzalez presented a serious risk of suicide, and that Turn Key participated in a policy it knew put unconstitutional limits on the number of inmates that could be housed in the mental health ward.

*Id.* (citation omitted) (emphasis added).

### b.  The Sheriff's Motion to Dismiss

The Sheriff argues Plaintiff has failed to establish an underlying constitutional violation for her deliberate indifference claim because she has not shown any specific Jail employee was aware of and deliberately disregarded Mr. Griego's condition. Like Turn Key, the Sheriff asserts Plaintiff has lumped Jail staff with Turn Key staff.[12] As previously discussed, *see supra* n.11, Plaintiff's failure to point to any *specific* Jail employee who was allegedly deliberately indifferent to Griego's condition is not fatal to the Complaint. And as the Court goes on to explain, the allegations give rise to the plausible inference that Turn Key and Jail employees, though not named in the complaint, received multiple reports of Griego's deteriorating and serious condition and yet failed to take any action to get him medical assessment or treatment.

The Sheriff also contends the Jail staff, as non-medical professionals, reasonably relied upon the advice and guidance of Turn Key staff, and thus cannot have been deliberately indifferent to Mr. Griego's needs. It may constitute deliberate indifference when a prison official "knows 'his role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and [] he delays or refuses to fulfill that gatekeeper role due to deliberate indifference.'" *Burke*, 935 F.3d at 992-93 (quoting *Sealock*, 218 F.3d at 1211). However, "[p]rison officials generally may rely on the advice and course of treatment prescribed by medical personnel." *Est. of*

---

[12] In his Reply, the Sheriff contends such lumping deprived him of notice of the claims against him. As discussed above, the Court has already found the limited number of Defendants and discrete time period of the allegations are sufficient to provide the Defendants—including the Sheriff—notice pursuant to Federal Rule of Civil Procedure 8.

*Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1265 (10th Cir. 2022) (citations omitted). Such reliance by prison officials must be reasonable. *Compare Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 403 (10th Cir. 2009) (unpublished) (rejecting jail official's argument that she reasonably relied on medical professional's opinion that inmate would be fine where the harmed inmate and other inmates repetitively sought help for the harmed inmate and jail official received reports the inmate was pale, clutching his chest, and complaining of a heart attack), *and Bros. v. Bd. of Cnty. Comm'rs*, No. CIV-21-418-SLP, 2023 WL 4041854, at *8-9 (W.D. Okla. June 15, 2023) (finding factual issue existed as to whether jail staff reasonably relied on medical personnel's decisions not to seek advanced medical help for inmate who could not urinate, sit upright, feed himself, was covered in his own waste, and told detention staff he could not move his hands or arms), *with Cox v. Koch*, No. 11-CV-0771-CVE-TLW, 2013 WL 6002225, at *18-19 (N.D. Okla. Nov. 12, 2013) (finding jail administrator reasonably relied on medical staff where he was aware medical staff were repeatedly seeing and treating inmate and there was no evidence he received complaints regarding the medical care provided).

The Court "may conclude that a jail official subjectively knew of the substantial risk of harm . . . from the very fact that the risk was obvious." *Weatherford*, 347 F. App'x at 403 (citing *Mata*, 427 F.3d at 752). As discussed above, Plaintiff has pleaded Mr. Griego spent The Week laying on his cell floor, barely above to move, eat, or drink and covered in his own waste for at least part of that time. Plaintiff has pleaded that despite Griego's and his cellmate's entreaties to Turn Key and Jail staff alike, Griego went days without assessment or treatment. The facts as pleaded by Plaintiff, if true, indicate it would have

been obvious to Jail staff who were aware of Griego's situation that he faced a substantial risk of serious harm. Yet the allegations indicate Jail staff "opted . . . to disregard th[e] risk, taking no action on [Griego's] behalf for" days. *Id.* at 404. This is enough to plausibly support the subjective component of—and thus to establish an underlying constitutional violation for—Plaintiff's deliberate indifference claim.[13] *See Bros. v. Bd. of Cnty. Comm'rs*, No. CIV-21-418-SLP, 2022 WL 20686898, at *4 (W.D. Okla. Mar. 30, 2022) (plaintiff established subjective component of deliberate indifference claim against sheriff by pleading the inmate had medical needs jail and Turn Key staff knew of, yet he was removed from medical observation and medical personnel ignored his complaints).

The Sheriff argues that even if Plaintiff has pleaded an underlying constitutional violation of Mr. Griego's rights, she has failed to adequately allege facts to establish an

---

[13] The Sheriff seemingly focuses his arguments on Jail staff.

> [T]o the extent Defendant purports to contend the Sheriff is relieved of any liability for conduct of Turn Key medical personnel, such a contention is incorrect. *See, e.g.*, *Estate of Crowell ex rel. Boen v. Bd. of Cnty. Comm'rs*, 237 P.3d 134, 142 (Okla. 2010) (explaining that "[u]nder Oklahoma law, the sheriff is the final policymaker for a county jail," and is responsible for providing medical care to those in custody at the county jail) (citing OKLA. STAT. tit. 19, § 513; OKLA. STAT. tit. 57, §§ 47, 52); *see also Buchanan v. Turn Key Health Clinics, LLC*, No. 18-CV-00171-JFH, 2022 WL 2070493, at *6 (E.D. Okla. June 8, 2022)[, *reversed in part on other grounds in Buchanan*, 2023 WL 6997404] (finding that Turn Key employees "may be considered subordinates of the Sheriff" for purposes of *Monell* liability as "[t]he Supreme Court has made clear that the provision of medical care by an independent contractor does not prevent finding a jail official liable under § 1983") (citing *West v. Atkins*, 487 U.S. 42, 56 (1988)).

*Bros.*, 2023 WL 4041854, at *9 n.14 (citations altered and supplemented).

official policy or custom caused Griego's injuries and that the Sheriff acted with the requisite state of mind to hold him liable for the alleged violation.

"Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's prisoners of the means to vindicate their Eighth Amendment rights." *West*, 487 U.S. at 56. Where a sheriff "further[s] a 'policy or custom,' *see Schneider*, 717 F.3d at 769, of deficient medical care at [a] jail characterized by inadequate training, understaffing, and chronic delays," he can be found to have "acted with deliberate indifference toward the risk that the policy or custom of providing inadequate medical care would result in an injury." *Burke*, 935 F.3d at 1001; *see also Layton v. Bd. of Cnty. Comm'rs*, 512 F. App'x 861, 871-72 (10th Cir. 2013) (finding genuine question of fact as to whether sheriff/county were deliberately indifferent where sheriff knew of jail's medical system deficiencies but did not remedy them); *Garcia v. Salt Lake Cnty.*, 768 F.2d 303, 308 (10th Cir. 1985) ("Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care.").

Plaintiff argues she has alleged the existence of systemic failures of the Jail's policies, staffing, and procedures. The Court agrees. Plaintiff has pleaded the Jail and Cleveland County "failed to ensure that the Jail was properly staffed, jailers were adequately trained, and that jailers conducted their required checks, especially on inmates" with serious medical needs like Griego. Compl., ¶ 305. Plaintiff asserts policies perpetuated by Turn Key, such as inadequate staffing, failure to properly assess and treat

inmates with serious medical needs, failure to adequately train and supervise medical staff,[14] and other cost-cutting actions[15] were encouraged and maintained despite their known and obvious dangers. *Id.* ¶¶ 332-33. And as discussed above, Plaintiff cited examples of similarly situated individuals being mistreated in similar manners. *See Miller v. Okla. Cnty. Crim. Just. Auth.*, No. CIV-22-00665-JD, 2025 WL 2325184, at *7-8 (W.D. Okla. Aug. 12, 2025) (plaintiff adequately alleged informal custom of jail officials by, among other things, citing prior incidents and reports of guards using excessive force against similarly situated detainees); *Carney v. City of Denv.*, 534 F.3d 1269, 1274 (10th Cir. 2008) ("In attempting to prove the existence of [] a 'continuing, persistent and widespread' custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way.").

Furthermore, Plaintiff has adequately alleged these policies or customs caused Mr. Griego's injuries. Plaintiff has alleged systemic failures, including (1) inadequate staffing, (2) inadequate training, (3) cost-cutting policies, and more, led to Griego being ignored for

---

[14] The Sheriff disputes each "individual" policy or custom alleged by Plaintiff, particularly the claims that the Sheriff failed to train and/or supervise Jail and Turn Key staff. Plaintiff "alleges facts that go to several of the[] bases [constituting an official policy]. However, at this stage, the Court does not need to determine which precise theory would be successful." *Ramirez*, 2024 WL 2732300, at *4 n.6; *see also Bros.*, 2023 WL 4041854, at *10 (denying motion for summary judgment where plaintiff did not "rely on evidence of a 'single specific policy'" but rather submitted "evidence to show systemic failures at the Oklahoma County Jail" such as deficiencies in staffing, inmate-monitoring, access to medical care, and medical care training for detention staff).

[15] As stated above, allegations of cost-cutting policies based not solely on the contract, but also on claims of inadequate medical staff and examples of similarly situated individuals, can support a deliberate indifference claim.

23

The Week despite his obvious medical crisis. *See Ramirez*, 2024 WL 2732300, at *3-4 (allegations of customs of inadequate staffing, inadequate training and supervision, inadequate medical assessment and treatments, and avoidance of offsite medical care were sufficient to plead a systemic failure caused an inmate's injuries); *Prince*, 28 F.4th at 1051 ("[A] Sheriff's 'continuous neglect' of medical conditions similar to those in this case could lead a reasonable fact finder to infer causation of a plaintiff's injury sufficient to defeat summary judgment."); *Burke*, 935 F.3d at 1001 (evidence of policy or custom of understaffing medical personnel, inadequately training staff, and failing to timely address inmates' medical issues supported jury finding such deficiencies caused inmate's death).

Lastly, Plaintiff has adequately pleaded the Sheriff "had 'actual or constructive notice that [his] action or failure to act was substantially certain to result in a constitutional violation' and 'consciously or deliberately chose to disregard the risk of harm.'" *Finch v. Rapp*, 38 F.4th 1234, 1244 (10th Cir. 2022) (quoting *Barney*, 143 F.3d at 1307) (alterations omitted). "Notice can be established through a 'pattern of tortious conduct' or 'if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction.'" *Id.* (quoting *Barney*, 143 F.3d at 1308) (internal quotation marks omitted).

Plaintiff has cited past harms coming to inmates in the Cleveland County Detention Center related to inadequate medical care. Those examples include situations wherein an inmate (1) with known or obvious serious medical conditions (2) was ignored by Jail and Turn Key staff (3) for long time periods (4) despite pleas or the pleas of other inmates for treatment. These are sufficient, at this stage, to plead the Sheriff's deliberate indifference.

24

Plaintiff has adequately pleaded an underlying constitutional violation of Mr. Griego's right to adequate medical care and that the Sheriff was deliberately indifferent to the risk that existing policies or customs of deficient medical care at the Jail would cause Mr. Griego's harms.[16] The Sheriff's Motion to Dismiss [Doc. No. 6] is DENIED.[17]

IT IS SO ORDERED this 1st day of April, 2026.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE

---

[16]

> Of course, [the Court] cannot determine from the face of the [Complaint] whether the plaintiff[] will be able to substantiate [her] *Monell* claim. But "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (quotation marks and citations omitted)). So [the Court] conclude[s]— given the . . . low bar for surviving a motion to dismiss—the plaintiff[] alleged enough to explore [her] *Monell* claim in the discovery process. *See id.* (observing that "granting a motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice" (quotation marks, alterations, and citation omitted)).

*Quintana*, 973 F.3d at 1034.

[17] Because the Court finds Plaintiff has adequately alleged the existence of a policy or custom sufficient for her *Monell* claim to survive the 12(b)(6) stage, it need not address her failure to train/supervise claim.

25